

# NUMBER 13-20-00107-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**TYLER FARMER,**                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                      **Appellee.**

---

### On appeal from the 148th District Court
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina
Memorandum Opinion by Justice Longoria**

Appellant Tyler Farmer appeals his conviction of felony murder, a first-degree felony for which he was sentenced to thirty-nine years' imprisonment. *See* Tex. Penal Code Ann. § 19.02(b)(3). By four issues, Farmer contends (1) his Sixth Amendment rights were violated by his trial counsel's "continuous statements to the jury that Farmer was guilty of aggravated assault," (2) the indictment and jury charge were invalid, (3) he

received ineffective assistance of counsel, and (4) the trial court erred by not including an instruction regarding accomplice witness testimony. We affirm.

## I.    BACKGROUND

The indictment alleged that on or about November 18, 2017, Farmer, acting alone or together with Gavin Escoto, James Lockhart, and/or Kayla Valdez, committed or attempted to commit an act clearly dangerous to human life, "namely shooting a firearm at or in the direction of a group of people, that caused the death of one of those people, namely Gilbert Sierra"; that Farmer "was then and there in the course of intentionally and knowingly committing a felony, namely [a]ggravated [a]ssault"; and that Sierra's death was caused "while [Farmer] was in the course of and in furtherance of the commission or attempt of said felony." *See id.*

At trial, Jesus Cruz testified he and Farmer had a contentious history involving Farmer's then-girlfriend, Valdez. According to Cruz, when he and Valdez worked together, Valdez was in an altercation with another co-worker, and Cruz posted a meme on Facebook indicating that Valdez had lost the fight. Cruz stated that Farmer called him and said he wanted to fight because of the Facebook post. Months later, Cruz encountered Farmer and Valdez at a store, and he and Farmer argued. They continued their argument on Facebook, challenging each other to a fight in the parking lot of a restaurant. They met at the parking lot and engaged in a fist fight, which Sierra, Cruz's cousin, shared to Facebook via live stream. According to Cruz, he and Farmer decided the following day that they would meet up to fight again, this time at an elementary school in Corpus Christi.

2

Cruz testified that he arrived at the school's basketball court between 6:30 p.m. and 7:00 p.m. with his cousin, Sierra. They were joined by another cousin, Brandy Tapia, and three others. Cruz stated that the group waited nearly two hours for Farmer. Eventually, Cruz received a message that Farmer was on his way to the school. Shortly thereafter, Cruz heard approximately six to eight gunshots, and he then heard Sierra saying that he had been shot. Sierra was holding his chest and "crawling" away from the direction of the shots. When the shooting stopped, Cruz went to help his cousin and called 911. Cruz stated he and the others were attempting to help Sierra by applying pressure to the wound while waiting for medics to respond. Cruz stated that because it was dark at the time, he was only able to see "flashes" of the gunshots, and he could not see who fired the shots. He said neither he nor anyone with him had a firearm at the time. On cross-examination, Cruz admitted he felt guilt and remorse over the incident because he had set up the fight with Farmer.

Tapia testified that Sierra had called her and told her there was going to be a fight, and she decided to go to the elementary school that night to support Cruz and to be there in case Valdez tried to join the fight. She explained that when the shots were fired, she dropped to the ground, "hit [her] chin and fell sideways." At that point, she saw Sierra grab his stomach and "dive" to the ground. She later found out that Sierra had been shot, and she called 911. She used two shirts from her friends to apply pressure to Sierra's wound and contain the bleeding until the medics arrived. While she believed that no one that was on the basketball court had a gun, she stated on cross-examination that she could not be certain.

3

Several officers from the Corpus Christi Police Department responded to the scene. The officers separated witnesses and took statements, secured the scene, and searched the area for shell casings. Three casings were found from a .40-caliber weapon. Based on information provided by witnesses, officers went to Farmer's apartment to question him regarding the shooting. Upon the officers' arrival, no one was present at the apartment, so they left and returned approximately forty minutes later. When the officers returned, they could hear voices in the apartment, and they surrounded the location. Two officers then knocked on Farmer's door, announced their presence, and identified themselves as police officers.

Officer Andrew Gebauer testified that, after knocking on Farmer's door, he and Officer John Paul Ghezzi were notified that Farmer and three others—later identified as Escoto, Lockhart, and Valdez—were attempting to flee using the balcony. Gebauer located Farmer on a neighbor's balcony and Escoto, Lockhart, and Valdez on Farmer's balcony. At that point, according to Gebauer, Farmer attempted to "run away through the neighbor's apartment." Gebauer chased Farmer, who was stopped in the doorway of the neighbor's apartment by another officer. Gebauer stated that Farmer was not arrested pursuant to a warrant; instead, Gebauer testified that Farmer had violated several laws in his presence, including escaping from custody, evading arrest, and criminal trespass.

Ghezzi testified that, after Farmer, Escoto, Lockhart, and Valdez attempted to evade the officers at the apartment, the four individuals were brought to the police station. According to Ghezzi, as he and other officers were escorting the four individuals out of the apartment, he noticed there was "an ammo box that had several firearms and ammunition in it" on the floor of the bedroom connected to the balcony.

4

Detective Edward Alvarado testified that when he first interviewed Farmer at the police station, Farmer claimed not to know anything about the shooting. Several days later, when Alvarado went to the jail to obtain a DNA sample from Farmer pursuant to a search warrant, Farmer asked to speak with Alvarado privately. Alvarado brought the DNA sample to the police station and returned to the jail, where he interviewed Farmer a second time. A video recording of the interview was entered into evidence and played for the jury. During the interview, Farmer stated that after "the idea sprung up to shoot to scare" the people at the basketball court, he shot a .40-caliber Smith & Wesson pistol into the air, Escoto shot a nine-millimeter Hi-Point at the ground, and Lockhart shot a Ruger at a "fat dude." They each shot two to three times. Farmer later said he shot into the ground in front of him.

Katherine Pina, a crime scene investigator, testified she went to the hospital where Sierra was taken and photographed his body and possessions. She was then dispatched to the apartment where Farmer was found. She was advised that a search warrant was being executed, and she went to the apartment to process the scene. Four firearms, "close to" 100 rounds of ammunition, casings, shotgun shells, and firecrackers were located in the apartment and examined for fingerprints. Pina testified that she "swabbed" each firearm to collect DNA, which was then sent to a lab for testing.

Another crime scene investigator, Abby Sharp, testified that she processed the scene at the elementary school basketball court. She observed and collected the three .40-caliber casings located by police, and she created a sketch to show where the casings were found in relation to the basketball court and where Sierra was shot. Sharp also photographed the scene, which included discarded bloody clothing and a bloody "trail" on

the basketball court. Sharp later tested Farmer for gunshot residue, which the parties stipulated yielded positive results. Sharp stated that a gunshot residue test must be performed within "a four-hour window of when the gun was possibly fired" or it will not be accepted for testing at the crime lab.

Medical examiner Ray Fernandez, M.D., testified that he examined Sierra's body and that the cause of death was a bullet wound to the lung and heart, lodging in the back chest wall. Sharp collected a "DNA spot card," "some hair samples," "a bullet, [and] two copper jacket[]s" from Fernandez after the autopsy was performed. The bullet and casings were processed for fingerprints, which came back negative, and then submitted for firearms analysis.

Carolyn Martinez, a firearm and tool mark examiner, testified that she test-fired the weapons found in Farmer's apartment and "compared the known samples from these firearms to the questioned samples that [she] received from [the] crime scene investigator." Martinez opined that the fragments of bullet extracted from Sierra were fired from the .40-caliber Smith & Wesson gun found in Farmer's apartment. The parties stipulated that DNA recovered from this gun "belongs to [Farmer]."

Lockhart testified that he and Farmer worked together in the morning and met up later that evening at the apartment. Lockhart knew that Farmer got "into an argument on social media" and that a fight was planned. He said he wanted to attend the fight to support Farmer if needed. According to Lockhart, Valdez was driving the truck, Farmer was in the front passenger's seat, Lockhart was sitting behind Valdez, and Escoto was sitting behind Farmer. Lockhart recalled that, when the group arrived at the basketball court, he noticed they were outnumbered. At that point, Lockhart testified, the decision

6

was made to fire gunshots as "a scare tactic." He did not recall who told the group to begin shooting, but he noted that Valdez gave each of the others a gun from her purse. Lockhart testified that he was handed a nine-millimeter Ruger handgun; Farmer had a Smith & Wesson; Escoto had a Hi-Point; and Valdez did not have a weapon. Once the guns were distributed, they rolled the windows down and began shooting. Lockhart stated he did not fire his weapon because he would have had to "[shoot] past [Escoto's] face." After the shots were fired, they drove away quickly. Lockhart said that no one in the vehicle thought that anyone on the basketball court had actually been shot.

Lockhart was interviewed three times by police. He admitted that he initially lied to the police, fabricating a story for his whereabouts during the shooting; however, he later decided to tell the truth. Lockhart testified that, as part of a plea agreement, he pleaded guilty to manslaughter and agreed to "tell the truth" in Farmer's case; in exchange, the State recommended, and he received, a ten-year probated sentence.

On cross-examination, Lockhart stated that he recalled Farmer instructing them to "shoot at the ground" but not at the group of people. He acknowledged that his plea agreement was reached prior to the time he made his final statement to police, and that he also agreed to testify in Valdez's separate trial.

Escoto testified that he was with Farmer and Lockhart on the day of the shooting. They made the decision to go to the basketball court to fight and began to drive there. He initially testified that the three men were each armed and that Valdez was not present. He said he had a Hi-Point nine-millimeter, he gave a Smith & Wesson to Farmer, and Lockhart had brought his own gun. When they arrived at the basketball court, there were twelve people. After waiting ten to fifteen minutes, Escoto told everyone to shoot but not

7

to hurt anyone. He testified that they each shot their guns out of the windows. After the shooting, Escoto stated that he drove the group back to the apartment to "get ready to get rid of the guns" but the police arrived before he had the opportunity.

The jury was instructed on the charged offense, the lesser included offenses of aggravated assault and deadly conduct, and the law of parties under penal code § 7.02(b). *See id.* § 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."). The jury found Farmer guilty of felony murder and, in accordance with the court's instructions, did not consider the lesser included offenses. The jury also affirmatively found that a deadly weapon was used or exhibited during the commission of the offense or in the immediate flight therefrom.

Farmer was sentenced as set forth above and this appeal followed.

## II.    DISCUSSION

### A.    Predicate Felony

By his second issue, which we address first, Farmer contends that the indictment and jury charge were defective because "felony murder cannot be predicated on the underlying offense of aggravated assault as worded" therein.

The felony murder statute provides:

A person commits an offense if he . . . commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3). This statute "dispenses with any inquiry into the

8

*mens rea* accompanying the homicide itself"; rather, "[t]he underlying felony supplies the necessary culpable mental state" for murder. *Garrett v. State*, 573 S.W.2d 543, 545 (Tex. Crim. App. 1978). Thus, a felony murder prosecution "must rest on the proposition that the intent with which the [predicate felony] was committed can be transferred to the act which caused the homicide." *Id.* With these considerations in mind, the Texas Court of Criminal Appeals held in *Garrett* that "[t]he legislative prohibition against resting a [felony murder] prosecution on voluntary manslaughter necessarily includes a prohibition against resting such a prosecution on offenses statutorily includable in voluntary manslaughter." *Id.* at 546. The Court later clarified in *Johnson v. State* that "[n]ot every 'assaultive' offense, if alleged as an underlying felony, will merge with the homicide in a felony murder indictment." 4 S.W.3d 254, 256 (Tex. Crim. App. 1999) (citing *Ex parte Easter*, 615 S.W.2d 719, 721 (Tex. Crim. App. 1981)). Instead, a conviction under § 19.02(b)(3) is prohibited only "when the underlying felony is manslaughter or a lesser included offense of manslaughter." *Id.* at 258 (holding that "*Garrett* did not create a general 'merger doctrine' in Texas").

Here, the indictment alleged that Farmer "was then and there in the course of intentionally and knowingly committing a felony, namely [a]ggravated [a]ssault." As both parties recognize, however, an aggravated assault committed "intentionally and knowingly" is not a lesser included offense of manslaughter because it requires proof of a more culpable mental state. *Lawson v. State*, 64 S.W.3d 396, 397 (Tex. Crim. App. 2001); *see* Tex. Penal Code Ann. § 19.04(a) (providing that a person commits manslaughter "if he recklessly causes the death of an individual"); *id.* §§ 22.01(a)(2), 22.02(a)(2) (providing that a person commits aggravated assault if, among other things,

9

he intentionally or knowingly threatens another with imminent bodily injury while using or exhibiting a deadly weapon); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09(3) (stating that an offense is a lesser included offense if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission"); TEX. PENAL CODE ANN. § 6.01(d) (classifying "intentional" and "knowing" as higher degrees of culpability than "reckless"). Accordingly, the indictment was not defective in this regard.[1]

On the other hand, the jury charge failed to consistently specify that the predicate felony offense of aggravated assault must have been committed "intentionally or knowingly" in order for Farmer to be guilty of felony murder. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (providing that the jury charge must "distinctly set[] forth the law applicable to the case"). In a section entitled "Accusation," the charge accurately recited the allegation as contained in the indictment. However, in a subsequent section entitled "Relevant Statutes," the charge stated in part:

> To prove that the defendant is guilty of aggravated assault, the state must prove, beyond a reasonable doubt, two elements. The elements are that—
>
> 1. the defendant threatened another with imminent bodily injury; and
>
> 2. used or exhibited a deadly weapon during the commission of the offense.

And in the application paragraph concerning felony murder, the charge stated:

> You must determine whether the state has proved, beyond a reasonable doubt, three elements. The elements are that—
>
> 1. the defendant, in Nueces County, Texas, on or about November 18,

---

[1] We note that, in any event, appellant failed to preserve any issue concerning error in the indictment because he did not raise the issue prior to the first day of trial. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b) ("If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding.").

2017, committed the felony offense of aggravated assault; and

2. in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt of the felony offense of deadly conduct or aggravated assault, the defendant committed or attempted to commit an act clearly dangerous to human life by firing a firearm at or in the direction of a group of people; and

3. the act clearly dangerous to human life caused the death of Gilbert Sierra.

We agree with Farmer that the charge was erroneous because the application paragraphs did not specify, either directly or by reference, that the aggravated assault must have been committed "intentionally or knowingly." Instead, the application paragraphs permitted the jury to convict Farmer of felony murder based on a predicate finding that he committed aggravated assault recklessly—an offense which may be a lesser included offense of manslaughter. *See id.* §§ 22.01(a)(2), 22.02(a); *Johnson*, 4 S.W.3d at 256; *Garrett*, 573 S.W.2d at 546.[2] Indeed, the application paragraph allowed the jury to find Farmer guilty of the predicate felony without finding that he acted with any culpable mental state whatsoever. *See id.* §§ 22.01(a)(2) (stating that aggravated assault by threat is an offense only if it is committed "intentionally or knowingly"), 22.02(a). We further agree with Farmer that the application paragraph for the second element was erroneous because it suggested that the predicate felony offense may have been deadly conduct, while the application paragraph for the first element did not include deadly

---

[2] Pointing to the "Accusation" section of the charge and citing *Plata v. State*, the State contends that "a logically consistent combination of the paragraphs in the jury charge provided adequate instruction on the statutory elements of the underlying felony." *See* 926 S.W.2d 300, 304 (Tex. Crim. App. 1996) (stating that an adequate charge must contain an application paragraph which either "specif[ies] all of the conditions to be met before a conviction . . . is authorized" or "authoriz[es] a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs"), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997). But the application paragraph did not "necessarily and unambiguously" refer to the "Accusation" section, *see id.*, and the definition of the offense suggested in the "Accusation" section conflicted with the definition in the "Relevant Statutes" section.

11

conduct as a potential predicate felony offense.

Having found error in the charge, we proceed to a harm analysis. When error in the charge is not preserved by timely objection at the charge conference, as here, the error will only result in reversal of the conviction upon a showing of "egregious harm" to the appellant. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015); *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm deprives an appellant of a "fair and impartial trial." *Price*, 457 S.W.3d at 440. "Errors that result in egregious harm are those that affect the 'very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Warner v. State*, 245 S.W.3d 458, 461–62 (Tex. Crim. App. 2008) (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

Farmer argues that he was egregiously harmed by the error because "the only defense to the felony murder charge was that Farmer was reckless in committing the aggravated assault." We disagree. The predicate felony offense specified in the jury charge was aggravated assault by threat, but there was no evidence that Farmer "threatened" anyone recklessly, as opposed to intentionally or knowingly. *See* TEX. PENAL CODE ANN. § 6.03(c) ("A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.").[3] Farmer admitted to police that he and his companions

---

[3] Notably, aggravated assault by threat is only a crime if it is committed intentionally or knowingly. *See* TEX. PENAL CODE ANN. § 22.01(a)(2).

intentionally fired their guns with the intent to "scare" Cruz and the others who were waiting at the basketball court, and Lockhart corroborated that statement at trial. There was never any suggestion at trial that anyone fired their weapons accidentally or with any intent other than to threaten.[4] We therefore find it vanishingly unlikely that the jury based its guilty verdict on a finding that Farmer recklessly committed aggravated assault. The error did not affect the very basis of the case or a defensive theory, nor did it deprive Farmer of a fair and impartial trial. *See Warner*, 245 S.W.3d at 461–62.

Moreover, the charge accurately defined the offense of deadly conduct to include a "knowing" mental state, and the conduct alleged to be deadly conduct was identical to the conduct alleged to be aggravated assault—i.e., discharging a firearm at or in the direction of one or more individuals. *See id.* § 22.05(b)(1). By finding Farmer guilty, the jury necessarily found that he committed aggravated assault in this manner. Therefore, we cannot say that the error in the application paragraph for the second element caused egregious harm.

We overrule Farmer's second issue.

B.     **Accomplice Witness Instruction**

By his fourth issue, Farmer argues the jury charge was erroneous because it did not instruct the jury that the testimony of his accomplices must be corroborated.

Article 38.14 of the Texas Code of Criminal Procedure provides that a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the

---

[4] While Farmer and the others may not have intended to cause injury or death, such an intent is not a required element of aggravated assault as charged or as defined in the penal code. *See* TEX. PENAL CODE ANN. § 22.02.

corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. An instruction regarding this rule "is required when the evidence raises the question of whether a witness is an accomplice under a party-conspirator theory." *Zamora v. State*, 411 S.W.3d 504, 512 (Tex. Crim. App. 2013). A witness who is indicted for the same offense as the accused is an accomplice as a matter of law, and the trial judge must instruct the jury accordingly. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). It is undisputed that witnesses Lockhart and Escoto were charged with the same offense as Farmer; therefore, they are accomplices as a matter of law. *See id.* The State concedes that the trial court erred by failing to include an accomplice witness instruction regarding these individuals, and we agree.

Because appellant's counsel did not request such an instruction, we again review for egregious harm. *See Price*, 457 S.W.3d at 440. Farmer contends he was egregiously harmed by the lack of an accomplice witness instruction because "the only [non-accomplice] evidence implicating Farmer of a crime was his own admission that he fired a gun at the ground." But that itself constitutes evidence "tending to connect [Farmer] with the offense committed." *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. Moreover, in addition to Farmer's admissions to police, the non-accomplice evidence tending to connect Farmer with the offense also included: (1) Martinez's testimony that the bullet extracted from Sierra was fired from the same .40-caliber handgun which was found in Farmer's apartment and contained Farmer's DNA; (2) Sharp's testimony that Farmer tested positive for gunshot residue; and (3) the officers' testimony that Farmer attempted to flee from police through his neighbor's apartment.[5] Therefore, even if the jury had been

---

[5] Farmer contends Cruz is also an accomplice because he "instigated and orchestrated the entire

14

properly instructed, it is overwhelmingly likely it would have found that the evidence sufficiently corroborated the testimony of Lockhart and Escoto. *See Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. . . . Nor must the non-accomplice evidence directly link the accused to the commission of the offense. . . . Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.").

We conclude that the jury charge error did not egregiously harm Farmer because it did not affect any defensive theory or deprive him of a fair and impartial trial. *See Warner*, 245 S.W.3d at 461–62. Farmer's fourth issue is overruled.

## C. Sixth Amendment

Finally, Farmer raises two issues concerning his right to counsel under the Sixth Amendment. *See* U.S. CONST. amend. VI. To obtain reversal on the basis of ineffective assistance of counsel, an appellant must generally show that: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Garza*, 620 S.W.3d 801, 808 (Tex. Crim. App. 2021). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The

---

event by taunting Famer online" and "had every intention of getting into an altercation and committing aggravated assault himself." *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) ("An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state."). We assume but do not decide that Cruz is an accomplice, and we exclude his testimony from our consideration of corroborating evidence.

15

prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694).

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813.

### 1.    Admission of Aggravated Assault

First, Farmer complains that his trial counsel repeatedly conceded that Farmer was guilty of aggravated assault, the predicate felony offense supporting the charge of felony murder. *See* TEX. PENAL CODE ANN. § 19.02(c). For example, counsel made the following remark during opening argument at the guilt-innocence phase:

> The evidence in the case—well, you heard the indictment yesterday, right, and one thing that's important to note when hearing that indictment, it's a different type of a murder indictment. The indictment doesn't allege that he intentionally killed anyone. What the indictment alleges is that he committed the offense of an aggravated assault and during the course of that assault someone died, and there's a huge difference, and I think you'll see that as the evidence unfolds. The reason Mr. Farmer remained silent when the indictment was read to him yesterday is because he knows what the truth is, and he knows that he is guilty of an aggravated assault. The reason we're having this trial though is because sometimes the evidence can be

16

inconclusive in other ways, and I think that's what the evidence will show you, that he's not guilty of murder, but that he is guilty of the aggravated assault.

And at closing, counsel remarked: "[Farmer] is not guilty of murder. [Farmer] was with them, and he was shooting his gun to scare them, which is an aggravated assault."

By his first issue, Farmer contends that counsel's actions deprived him of his "right to have counsel maintain his innocence" under *McCoy v. Louisiana*, 138 S.Ct. 1500, 1509 (U.S. 2018) ("When a client expressly asserts that the objective of 'his defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (quoting U.S. CONST. amend. VI and citing MODEL RULES OF PRO. CONDUCT r. 1.2(a) (AM. BAR ASS'N 2016) ("[A] lawyer shall abide by a client's decisions concerning the objectives of the representation."))).

We first address the proper standard of review for this particular claim. As noted, under *Strickland* and its progeny, a defendant must overcome the presumption that counsel's actions might be considered sound trial strategy. 466 U.S. at 689; *see Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). However, some decisions—including whether to waive the right to a jury trial, whether to plead guilty, and whether to concede guilt on the charged offense—belong exclusively to the defendant and are not a matter of trial strategy. *McCoy*, 138 S.Ct. at 1508; *Turner v. State*, 570 S.W.3d 250, 274 (Tex. Crim. App. 2018); *Harrison v. State*, 595 S.W.3d 879, 886 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). "These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." *McCoy*, 138 S.Ct. at 1508. In such cases, "a client's autonomy, not counsel's competence, is in issue," and so the *Strickland* prejudice prong does not apply. *Id.* at

17

1510–11 ("Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless-error review."); *Harrison*, 595 S.W.3d at 886. Farmer argues that, as in *McCoy*, *Turner*, and *Harrison*, he does not need to show prejudice in order to obtain reversal on these grounds.

We disagree. Unlike the defendants in the other cases, Farmer's counsel never conceded that Farmer was guilty of the *charged* offense; instead, he conceded that Farmer was guilty of the *predicate* felony offense of aggravated assault, which is only one element of felony murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). The *McCoy* Court made clear that "strategic disputes about whether to concede an element of a charged offense" are not within the purview of its ruling. 138 S.Ct. at 1510. Moreover, Farmer never complained to the trial court about counsel's decision, and there is nothing in the record indicating that Farmer ever disapproved of counsel's decision prior to this appeal. *See Turner*, 570 S.W.3d at 276 (agreeing that "a defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial"). We therefore conclude that both prongs of *Strickland* apply to this particular Sixth Amendment claim.

Farmer discusses the *Strickland* prongs as they relate to this complaint in the first part of his third issue. He argues that counsel's decision to concede his guilt of aggravated assault was "outrageous" and lacked any "legitimate possible tactical or strategic basis." Farmer acknowledges that the commission of a predicate felony is only one element of felony murder, *see* TEX. PENAL CODE ANN. § 19.02(b)(3), but he contends that counsel's concession of guilt on this element "left the State with nothing to prove other than [that]

18

Farmer engag[ed] in dangerous conduct that resulted in death" and "took away any chance that a jury would find him guilty of the lesser offense of deadly conduct." Farmer notes that "[i]t was undisputed that [Sierra] was shot and died from one of the bullets shot by someone in the car with [Farmer]" and he argues that, "[b]ecause the actions of the aggravated assault and dangerous conduct were based on the same act of shooting the gun (regardless if Farmer's bullet was the fatal one), Farmer stood no chance of getting a 'not guilty' verdict for the charge of murder" as a result of counsel's actions.

To convict Farmer for felony murder as charged in the indictment, the jury must have found beyond a reasonable doubt that: (1) he committed aggravated assault; (2) he committed an act clearly dangerous to human life by shooting a firearm "at or in the direction of a group of people"; (3) the shooting was done in the course of and in furtherance of the commission of the aggravated assault; and (4) the shooting caused Sierra's death. *See id*. Because the jury charge contained an instruction on the law of parties under penal code § 7.02(b), the jury could also have convicted Farmer of felony murder if it found that: (1) he engaged in a conspiracy with others to commit aggravated assault; (2) one of his co-conspirators committed a felony resulting in Sierra's death; (3) the co-conspirator's felony was committed "in furtherance of the unlawful purpose" of the conspiracy; and (4) the co-conspirator's felony should have been anticipated as a result of carrying out the conspiracy. *See id.* § 7.02(b).

Counsel conceded Farmer committed aggravated assault—i.e., that he intentionally or knowingly threatened another with imminent bodily injury by using or exhibiting a deadly weapon. *See id.* § 22.02(a)(2). However, counsel did not concede that Farmer engaged in a conspiracy with anyone else to do so. *See id.* § 7.02(b). Moreover,

19

counsel did not concede that Farmer or any of his associates shot "at or in the direction of a group of people" or caused Sierra's death. We acknowledge that the evidence supporting these points was strong—just as it was with respect to Farmer's commission of aggravated assault—but counsel's options were limited. Further, Farmer did not file a motion for new trial and there is nothing in the record explaining counsel's actions. On this record, we cannot say that counsel's actions were "so outrageous that no competent attorney would have engaged in" them. *Andrews*, 159 S.W.3d at 101; *see Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992) (concluding that "defense counsel's conduct in conceding appellant's guilt in an apparent attempt to get the jury to find appellant guilty of a lesser offense can reasonably be explained as [a] trial tactic" because, "[a]lthough it was apparently unsuccessful, it was logical when the overwhelming strength of the State's case was considered"); *Jordan v. State*, 859 S.W.2d 418, 422 (Tex. App.—Houston [1st Dist.] 1993, no pet.) (finding it was a "well-reasoned trial strategy" for counsel, when "faced with overwhelming evidence of appellant's guilt," to "placate the jurors" by conceding guilt at closing "rather than to possibly antagonize them with an impassioned, though weakly supported, plea for a verdict of not guilty").[6]

## 2. Failure to Object to Indictment and Charge

In the remainder of his third issue, Farmer makes various other complaints regarding his trial counsel's performance. First, he contends his trial counsel was

---

[6] We note that challenges requiring development of a record to substantiate a claim, such as ineffective assistance of counsel, may be raised in an application for writ of habeas corpus. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07; *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). A habeas proceeding would "provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel's actions at . . . trial." *Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999); *see Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011) ("This Court has repeatedly stated that claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus.").

20

ineffective because he failed to object to the indictment and jury charge on the basis that they failed to specify a *mens rea* for the predicate felony offense of aggravated assault. We have already held that the indictment did not contain error in this regard and, while the jury charge was erroneous, Farmer did not suffer egregious harm from the error. Citing *Ex parte Drinkert*, 821 S.W.2d 953, 957 (Tex. Crim. App. 1991), Farmer nevertheless contends that the jury's decision "would probably have been different" had counsel objected to the charge. He contends that "[b]ecause the jury returned a general verdict, there is no way to determine if the jury convicted on the underlying felony of aggravated assault or deadly conduct" and "if the jury found that Farmer committed the aggravated assault to predicate the felony murder, it is impossible to decipher if they believed Farmer acted with knowledge, intent, or recklessness." We disagree. In the application paragraph for the first element of felony murder, the jury was properly instructed to convict Farmer only if it found he committed the predicate felony of aggravated assault, and without anything in the record to the contrary, we generally presume that a jury followed the court's instructions. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Further, as explained *supra* part II.A, there was no evidence that Farmer committed aggravated assault recklessly; therefore, there is no reasonable probability that, had the jury been correctly instructed on the *mens rea* for aggravated assault, the result would have been different. *See Napper*, 322 S.W.3d at 246; *cf. Drinkert*, 821 S.W.3d at 956–57 ("There exists a reasonable probability that the jury may not have convicted applicant had trial counsel objected and that theory not been submitted . . . the evidence of applicant's guilt is not so overwhelming as to conclude otherwise.").

21

### 3.    Failure to Recall Cruz

Farmer next complains of his trial counsel's failure to recall Cruz as a witness to "determine admissibility of potential impeachment evidence." Farmer notes that, three days after Cruz testified as the State's first witness, the lead prosecutor stated in open court that Cruz had been placed on "deferred prosecution as a juvenile" in 2014 for an unrelated offense. When the trial court asked why this criminal history had not been disclosed to the defense earlier, *see* TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (concerning discovery in criminal cases), the prosecutor stated "we had to independently verify it." The following colloquy then occurred:

[Defense counsel]:    I'm not—I don't even know what to do with something like that right now. We're so far along in the trial, I kind of want to get to the end of this, not start over, and not recall another witness. I don't know that I could use it for impeachment anyway, to tell you the truth.

. . .

THE COURT:    It's up to you. If you want to waive any possible error, we'll just leave it alone and continue with the trial. It's up to you. It's—but it is troubling because I think you had a right to have this information available when you conducted your cross examination. Without this information it puts you at a disadvantage, but that's up to you what you want to do.

[Defense counsel]:    I think retrying the case puts my client at a bigger disadvantage, so I just—

[Prosecutor]:    And, Your Honor, I did speak with the witness, he is on standby and available. I let him know he may have to come—we may have to recall him to address this, if it was something they could impeach. So, I did want the Court to know that, that it's not like we can't recall him. He is aware that he may have to be recalled for this.

[Defense counsel]:    Can we just say that I have it—I have it for review at

22

|  | this time, and I'll make a—I don't know what to say off the top of my head on this thing, but I know that I'm not going to be able to complain about it if I don't do something about it before the case goes to the jury. I just don't know whether I want to do anything with it or not. |
|---|---|
| [Prosecutor]: | I mean, a successfully completed deferred prosecution as a juvenile that has been dismissed five years ago isn't impeachment. |
| [Defense counsel]: | That's what I think. That's why I'm not concerned about it. |
| [Prosecutor]: | Under the rules it doesn't come up, and he didn't discuss it. Unless someone opened up the door to it—I mean, he could have denied, and then potentially it could have come up. I mean, that, I suppose, is possible, but he wouldn't have been entitled to go into it because it's not a permissible area of inquiry. |
| [Defense counsel]: | I think they're disclosing it because they feel obligated to disclose it. I accept that, but there's nothing I want to do with that now. I understand if I needed to recall [Cruz], we could have a hearing to determine whether it's even admissible. |

The trial continued and Cruz was not recalled.

Farmer contends his trial counsel provided ineffective assistance by failing to recall Cruz or move for a mistrial. However, both the prosecutor and defense counsel expressed their belief that the newly-disclosed evidence would not be admissible to impeach Cruz, and Farmer does not address that issue in his brief. *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) ("To successfully assert that trial counsel's failure to object amounted to ineffective assistance, the applicant must show that the trial judge would have committed error in overruling such an objection."); *see also* TEX. R. EVID. 608(b) ("Except for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to

23

attack or support the witness's character for truthfulness."); TEX. R. EVID. 609(c) ("Evidence of a conviction is not admissible if . . . probation has been satisfactorily completed for the conviction, and the person has not been convicted of a later crime that was classified as a felony or involved moral turpitude, regardless of punishment."). Farmer does not otherwise contend that, had counsel recalled Cruz or requested a mistrial, there is a reasonable probability the outcome of the trial would have been different. *See Napper*, 322 S.W.3d at 246; *see also* TEX. R. APP. P. 38.1(i).

### 4.     Failure to Request Accomplice Witness Instruction

Also by his third issue, Farmer argues his counsel was ineffective for failing to request an accomplice witness instruction to be included in the jury charge. In our discussion of Farmer's fourth issue *supra* part II.B, we concluded in part that the lack of such an instruction did not egregiously harm Farmer because there was ample non-accomplice evidence "tending to connect [Farmer] with the offense committed." *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. For the same reason, we conclude there is no reasonable probability that, had counsel successfully requested an accomplice witness instruction, the result of the proceeding would have been different. *See Napper*, 322 S.W.3d at 246.

### 5.     Punishment Phase

Farmer contends by the last part of his third issue that his counsel provided ineffective assistance at the punishment phase by: (1) failing to object to the admission of unnoticed extraneous offenses; (2) failing to object to "improper questioning" by the State; and (3) failing to interview his own witnesses.[7]

---

[7] Farmer cites *Ex parte Duffy*, 607 S.W.3d 507 (Tex. Crim. App. 1980), for the proposition that "no

24

As to extraneous offenses, Farmer's ex-girlfriend Samantha Nuzum testified at the punishment phase that Farmer was physically and emotionally abusive towards her on several occasions. Defense counsel did not object to her testimony, despite the fact that these prior bad acts were not disclosed in response to counsel's request. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g). Farmer contends that the lack of disclosure left him "with no opportunity to provide a defense to the bad acts, or for defense counsel to be prepared to impeach the witness." He further claims that "[t]he repeated testimony of specific instances of abuse by Farmer towards Nuzum was high[ly] prejudicial and undoubtedly contributed to his extreme sentence of 39 years in prison for this accidental murder." However, as noted, because there was no new trial motion or hearing, the record does not reveal counsel's reasons for his decision not to object to Nuzum's testimony. And we cannot say that counsel's decision was so outrageous that no competent attorney would have engaged in it. *See Andrews*, 159 S.W.3d at 101; *Heiman v. State*, 923 S.W.2d 622, 626 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (noting that "the decision not to object can be a plausible trial strategy as part of an attempt to create the appearance of being open and completely honest with regard to all questions"). Moreover, even if counsel had objected to Nuzum's testimony and the objection was granted, the trial court may have granted a continuance to allow defense counsel to prepare for rebuttal or impeachment. If that occurred, Nuzum's testimony would have nevertheless been before the jury, and there is nothing in the record indicating that counsel's attempts at rebuttal or

showing of prejudice is required" when an appellant claims ineffective assistance at the punishment phase of a noncapital trial. However, as the State notes, *Duffy* was overruled in 1999. *See Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999) ("[W]e perceive no valid reason why *Strickland* cannot apply, or why a different rule should apply, to noncapital sentencing proceedings."). Accordingly, both *Strickland* prongs apply to these ineffective assistance claims.

impeachment would have been successful. Therefore, on this record, Farmer has not shown that he suffered prejudice from counsel's decision.

As to "improper questioning," Farmer complains of certain questions posed to Tony Baker, a punishment witness for the defense. Baker testified that he is a "licensed minister" and he met Farmer a few months before Sierra's murder. After the murder, Farmer came to speak with him "every Sunday morning" about "changing to a Christian lifestyle." Baker opined that Farmer was "very sincere" about "wanting to change the path that he was on." On cross-examination, the prosecutor asked Baker several questions about the Bible, including the substance of the Ten Commandments; whether murder is a sin; and whether there are consequences to one's actions. Farmer argues that his counsel was ineffective for failing to object to the prosecutor's questions because they were asked "for no other reason but to inflame the jury's prejudice against Farmer and render him a bad person." He suggests, with reference to authority but without substantive analysis, that the questions and answers were unfairly prejudicial. *See* TEX. R. EVID. 403. However, again, the record is silent as to counsel's reasons for his decision not to object. On this record, we cannot say that counsel's decision was so outrageous that no competent attorney would have engaged in it, nor can we say there is a reasonable probability that a different decision would have led to a different outcome. *See Napper*, 322 S.W.3d at 246; *Andrews*, 159 S.W.3d at 101.

Finally, Farmer notes that, at his opening statement at the punishment phase, defense counsel stated that Farmer's "family members are here because they want to speak," but counsel noted that "I have not even spoke[n] to all of them, so it's hard to anticipate what they're going to say." Farmer contends counsel was ineffective for this

26

reason, and he posits that "[h]ad counsel interviewed [the witnesses] beforehand, he could have potentially produced a viable defense to the claims of abuse and violence." *See Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) (noting that counsel "has a responsibility to seek out and interview potential witnesses and failure to do so is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced"). We disagree. The mere potential for the discovery of useful evidence is not enough to show ineffective assistance for failure to investigate. *See Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) ("[A] claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably could have changed the result of the case."); *see also Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007) (rejecting appellant's ineffective assistance claim in part because his motion "d[id] not set out what evidence or information the 'named material witness' or a 'promised investigation' would have revealed that reasonably could have changed the result of this case"). Here, there is nothing in the record indicating what Farmer's family members would have testified to had counsel interviewed them beforehand, and Farmer suggests no other basis by which counsel's decision may have affected the outcome of the case. We conclude there is no reasonable probability that, had counsel interviewed Farmer's family members prior to trial, the result of the proceeding would have been different. *See Napper*, 322 S.W.3d at 246.

### 6.      Summary

Considering the totality of the representation, we reject Farmer's claims of ineffective assistance for the foregoing reasons. *See Thompson*, 9 S.W.3d at 813. His

27

first and third issues are overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
1st day of December, 2022.